# Exhibit A

STATE OF ILLINOIS
DEPARTMENT OF HUMAN RIGHTS

IN THE MATTER OF                           )
                                           )
Sawsan Jaber                               )
                                           )
COMPLAINANT                                )
                                           )          CHARGE NO.:
AND                                        )
                                           )          EEOC NO.:
Maine Township High School District 207    )
                                           )
RESPONDENT                                 )

# **A P P E A R A N C E**

Council on American-Islamic Relations, Chicago Chapter (CAIR-Chica , hereby enter the
(Name of law firm/attorney/non-attorney representative)

appearance of  Sawsan Jaber _____
              (Name of Complainant or Respondent)

and our Appearance as their attorney (or non-attorney representative), and request that copies of
all Pleadings, Orders, and other documents be served upon the undersigned for said Party in lieu
service upon the Party.

Heena Musabji _____
PRINT name of attorney/non-attorney representative
Council on American-Islamic Relations, Chica
Firm Name
17 N State St., Suite 1500
Address
Chicago            IL          60602
City               State       Zip Code
312-212-1520 Ext. 205
Telephone Number                                    ■ By checking this box, I consent to service of all
                                                      pleadings, orders, and other documents by the
hmusabji@cair.com                                     Department via electronic mail and understand
Email Address                                         that electronic service to this Email Address is
                                                      deemed complete upon transmission.

Fax Number

DATED: 04/07/2025 _____        By: _____
                                                      Signature

Rev. 4/2022

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974: See Privacy act statement before completing this form.

\#

| AGENCY | CHARGE NUMBER |
|---|---|
| ☒ **IDHR** | |
| ☐ **EEOC** | |

## Illinois Department of Human Rights and EEOC

| NAME OF COMPLAINANT (indicate Mr. Ms. Mrs.) | TELEPHONE NUMBER (include area code) |
|---|---|
| Mrs. Sawsan Jaber | ▓▓▓▓▓▓ |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| ▓▓▓▓▓ | ▓▓▓▓▓ | ▓▓▓▓▓ |
| | | MM / DD / YYYY |

**NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (IF MORE THAN ONE LIST BELOW)**

| NAME OF RESPONDENT | NUMBER OF EMPLOYEES, MEMBERS 15+ | TELEPHONE NUMBER (include area code) |
|---|---|---|
| Maine Township High School District 207 | Yes | 847-696-3600 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 1177 South Dee Road, Parkridge, IL, 60068 | | Cook |

| CAUSE OF DISCRIMINATION BASED ON: | DATE OF DISCRIMINATION EARLIEST (ADEA/EPA) LATEST (ALL) |
|---|---|
| National Origin, Ancestry, Race, Religion, Gender, Retaliation, Hostil | March 2025 |
| | ■ CONTINUING ACTION |

**THE PARTICULARS OF THE CHARGE ARE AS FOLLOWS:**

## S E E   A T T A C H E D

**Page 1 of 2**

| | |
|---|---|
| I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that the undersigned verily believes the same to be true. [735 ILCS 5/1-109] |
| | X _____  04/07/2025 |
| | **SIGNATURE OF COMPLAINANT        DATE** |

**EEO-5 FORM (Rev. 4/2022-INT)**                                                **RETURN THIS COPY**

**STATE OF ILLINOIS**
**DEPARTMENT OF HUMAN RIGHTS**

**CHICAGO OFFICE**

**DEPARTMENT OF HUMAN RIGHTS**
**555 W. MONROE ST., 7TH FLOOR**
**CHICAGO, ILLINOIS 60661**
**(312) 814-6200**
**(866) 740-3953 (TTY)**

**SPRINGFIELD OFFICE**

**DEPARTMENT OF HUMAN RIGHTS**
**524 S 2ND STREET, STE. 300**
**SPRINGFIELD, ILLINOIS 62701**
**(217) 785-5100**
**(866) 740-3953**

**CHARGE NO:** _____

**CONTROL NO:** _____

### CHARGE OF DISCRIMINATION

**COMPLAINANT**

Name    Sawsan Jaber
Address    ███████████
City, State ZIP    ███████████
Telephone Number    ██████████

**I believe that I have been personally aggrieved by a civil rights violation committed on**

**(Date/s of harm):** May 2021, May 2023 to March 2, **by:**

**RESPONDENT**

Name    Maine Township High School Distrcit 207
Address    1177 South Dee Road
City, State ZIP    Parkridge, IL, 60068
Telephone Number    847-696-3600

County    Cook

### S E E   A T T A C H E D

**Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matter the undersigned certifies as aforesaid that the undersigned verily believes the same to be true. [735 ILCS 5/1-109]**

     04/07/2025
**Complainant's Signature and Date**

**Sawsan Jaber IDHR Charge of Discrimination**
**<u>Charge of Discrimination</u>**

**Complainant:** Sawsan Jaber

| Complainant Contact Information: | Respondent Contact Information: |
|---|---|
| ███████████████████████ | Maine Township High School District 207 |
| | 1177 South Dee Road, Parkridge, IL, 60068 |
| | Phone: 847-696-3600 |
| | Maine West High School |
| | 1755 S Wolf Rd, |
| | Des Plaines, IL 60018 |
| | Phone: 847-827-6176 |

**I. ISSUE/BASIS**

**A. Unfair/Disparate Treatment –** May 2023 to March 2025, National Origin/Ancestry

**B. PRIMA FACIE ALLEGATIONS**

1. I am a Palestinian American.
2. I was hired on May 2, 2023, as the English Department Chair at Maine West High School.
3. There exists a clear pattern of discriminatory behavior at Maine West High School, under Maine Township High School District 207.
4. In around 2022-23, three teachers of color were pushed out of the English department for different reasons, one filed a grievance because she was not promoted (Department Chair Position) due to her race (Nicole Beyers-Black Latina), before leaving. Another left in 2023-24 because she was discriminated against because of her race and was unsupported by Dr. McMahon. The teachers who left other than Ms. Beyers were Aime Perez and Emily Deleon. They all moved to Maine East High School under the same school district.
5. Around the same time, Dr. Eileen McMahon (Principal of Maine West High School and Direct Supervisor) verbally attacked a black educator (Nicole Beyers) in a district equity meeting and was banned from future meetings. She is the only principal in the district not allowed to attend district equity meetings because of her actions toward people of color.
6. When the district confirmed my position, there were efforts led by a social science teacher to get me fired. Teachers from my department were at these board meetings trying to get me fired. They accused me of being anti-Semitic because of my Palestinian identity and advocacy. Dr. Christina Ramirez can confirm this. She was really upset about how I was informed and how Eileen minimized the whole attack. Eileen confirmed this one day before I started my work in August.
7. In around August 2023, I found out that an internal group of teachers (working with an outside organization) had been advocating to have my contract revoked for three months. I was labeled as anti-Semitic before even meeting colleagues due to my visible support and advocacy for

Palestine. This led to a culture where people physically moved away from me at meetings and Institute Days, reinforcing an isolating and discriminatory environment.

8. Since October 2023, I have been subjected to heightened scrutiny regarding my social media presence, professional decisions, and ability to evaluate Jewish colleagues, even though there was no evidence to warrant the same.

9. Dr. McMahon questioned how I could evaluate Jewish teachers fairly because of the concerns raised by the Union.

10. In October 2023, administrators investigated my social media posts for anti-Semitic content, even though they admitted there were none.

11. Around the same time, I was called into several meetings specifically to discuss my personal social media posts advocating for a ceasefire in Palestine. They checked my social media posts and did not find them problematic.

12. My wearing of a Palestinian beanie was deemed inappropriate and offensive by one of my department teachers, and I was told that it made my colleagues "uncomfortable," while similar cultural expressions by non-Palestinian colleagues were not scrutinized. As a person of Palestinian ancestry and origin, I was told that wearing a Palestinian beanie was inappropriate for someone in an administrative role and that I was misusing my authority by displaying it. The same teacher questioned whether I would be comfortable if she wore a Star of David, to which I responded yes, affirming my support for expressions of cultural and religious identity across all communities.

13. I have been continuously monitored and accused of bias and investigated publically, injuring my professional credibility and authority without basis, whereas non-Palestinian, non-Muslim educators or administrators have not been subjected to such invasive oversight or baseless accusations.

14. I was accused of hiring "my people" after two Arab teachers, Noor Alkhawja and Amira Hattab, were selected. However, the hiring process involved a team of 12 individuals and 5 rounds of the selection process with the involvement of at least 8 other district administrators, and the final decision was not mine alone. Out of approximately 250 applicants, 36 were interviewed. Both Ms. Alkhawja and Ms. Hattab ranked in the top five candidates based on team evaluations, with Ms. Hattab unanimously ranked as the number one choice.

15. I consistently received positive reviews for my performance at Maine West High School until January 07, 2024, due to the increasing pushback from both within the department and external sources, in response to my advocacy for Palestine.

16. In February 2024, Dr. McMahon made a shocking statement during a discussion about Palestinian advocacy: "*If you people are free, you would cause another Holocaust.*"

17. The school's sudden concern with my views on Palestine appeared to be driven not by any internal misconduct, but by growing external pressure, particularly from advocacy groups and community members reacting to my identity and advocacy work.

18. On April 26, 2024, Todd Ruder, a white male teacher in my department, yelled "You are hiring your people" in reference to the hiring of two Arab teachers for the upcoming school year

beginning in August. I reported this discriminatory remark to Dr. McMahon and Dr. Jen Loika.

19. When I was provided with no support to deal with this situation, I decided to plan a restorative circle with Dr. Payne and my whole team. My team refused to participate by agreeing to stay quiet during the circle, hindering its possible impact.

20. In August 2024, when the two new teachers of color, Amira Hattab and Noor Alkhawja, joined, they were targeted by my department. Other staff members of color in the department, including Alejandro Gonzales, a teaching assistant, were targeted by my department. Teachers made explicit statements that we did have problems until people of color joined.

21. In October 2024, I spoke at the Courageous Conversations Summit, presenting a session on Palestine. Maine West's librarian (Nicole Coover-Thompson) attended the session as well and she came back and started a rumor districtwide using the Teacher's Union as a mechanism that I made antisemitic comments in my session, even though I did not.

22. The next morning, Ms. Coover-Thompson admitted she lied in front of the administrators. However, the district continued an investigation for three months. I was cleared, but nothing was done to restore my reputation, and no formal apology was issued.

23. She is still employed and is a part of the department, without any accountability for lying and spreading rumors about me. I had to continue working with her despite continually asking for boundaries or some type of intervention.

24. The investigation conducted by Mr. George Dagres, Assistant Superintendent of Human Resources at Maine Township High School District 207, concluded that the allegations against Ms. Coover-Thompson were unfounded. Following the investigation, the district failed to take any steps to hold Ms. Thompson accountable.

25. Ms. Thompson filed a formal grievance and brought a discrimination case to the Teachers Union. That is how the district got involved. I had no support from the Union since my position does not allow me to be a part of the Union. I also had no support from administrators and spent hours of time during work hours answering questions regarding the false accusations.

26. The real reason she filed the grievance was the curriculum change, which made The Night optional and included Palestinian content among the choice novels. Someone from the department tipped off and provided an extremist organization of this curricular change and misrepresented the information leading to a public attack on me on social media and in the district.

27. In November 2024, after I raised concerns and asked Dr. McMahon to address the librarian's anti-Palestinian slander, including her false accusation that I was antisemitic for sharing my lived experience about Palestine and her attempts to have me fired, Dr. McMahon falsely claimed that I had demanded the librarian's termination. Instead of addressing the harm caused, Dr. McMahon offered a restorative circle with the very person who had exhibited anti-Palestinian behavior.

28. During the conversation about holding Ms. Thompson accountable, I said to Dr. McMahon I am not antisemitic and I am tired of speaking to this accusation and having to prove myself

innocent. She said, "*I know you are not antisemitic. If I thought you were, you would not be here.*"

29. The incident suggests a hierarchy of whose concerns are seen as legitimate or worthy of protection.

30. Meanwhile, continued baseless accusations of anti-Semitism led to excessive scrutiny of my pro-Palestine activities both inside and outside the school, exposing a clear double standard in how discrimination is addressed.

31. On November 14, 2024, a white sophomore student in a genocide studies class taught by an Algerian teacher, directed a violent, racist threat toward the teacher, saying: "*You terrorist bitch, I am going to kill you.*" A threat assessment was conducted following the incident, but the teacher was instructed to return to the classroom with the same student.

32. I raised concerns about the teacher's safety in remaining in the same environment with the student, especially given the severity of the threat. I emphasized that her safety should not be compromised or left to chance in hopes the situation wouldn't escalate. I was made to feel as though it was not okay to advocate for Arab teachers and it was not a valid threat.

33. Their resolution was that he did not have access to a gun and that I was elevated (intense) in dealing with the situation.

34. In contrast, when there was a "rumor" about a school shooting threat in May 2023, there was chaos and teachers jumped out of the windows. Somehow the school shooting alarm went off. That situation was taken very seriously by the school. That incident, based on far less concrete information, was taken extremely seriously by the administration.

35. For the majority of my time as Department Chair, I was constantly being pulled into investigations, consuming much of my day and making it difficult to carry out my actual responsibilities.

36. Tony Tavano (Teacher at Maine West) also told me he "needed to protect his colleagues from me," implying I was a threat.


## II. ISSUE/BASIS

**A. Unfair/Disparate Treatment –** May 2023 to March 2025, Race

**B. PRIMA FACIE ALLEGATIONS**

1. I am an Arab American.

2. In 2023, I was approached by three people in the district to apply for the English Department Chair position at Maine West High School under Maine Township High School District 207. Dr. McMahon was one of the people who approached me for this position.

3. I was hired on May 2, 2023, as the English Department Chair at Maine West High School for the 2023-24 school year which starts in August.

4. There existed a clear pattern of discriminatory behavior at Maine West High School, under Maine Township High School District 207.

5. In around 2022-23, three teachers of color were pushed out of the English department for different reasons, one filed a grievance because she was not promoted (Department Chair

Position) due to her race (Nicole Beyers-Black Latina), before leaving. Another left in 2023-24 because she was discriminated against because of her race and was unsupported by Dr. McMahon. The teachers who left other than Ms. Beyers were Aime Perez and Emily Deleon. They all moved to Maine East High School under the same school district.

6. Around the same time, Dr. Eileen McMahon (Principal of Maine West High School and Direct Supervisor) verbally attacked a black educator (Nicole Beyers) in a district equity meeting and was banned from future meetings. She is the only principal in the district not allowed to attend district equity meetings because of her actions toward people of color.

7. I consistently received positive reviews for my performance at Maine West High School until I was targeted due to my race.

8. In around August 2023, I found out that an internal group had been advocating to have my contract revoked for three months. I was labeled as anti-Semitic before even meeting colleagues because of my longstanding advocacy and support for Palestine, as an Arab Muslim educator. This led to a culture where people physically moved away from me at meetings and Institute Days, reinforcing an isolating and discriminatory environment.

9. Since October 2023, I have been subjected to heightened scrutiny regarding my social media presence, professional decisions, and ability to evaluate Jewish colleagues, even though there was no evidence to warrant the same.

10. Dr. McMahon, the principal, questioned how I could evaluate Jewish teachers fairly because of the concerns raised by the Union.

11. In October 2023, administrators investigated my social media posts for anti-Semitic content, even though they admitted there were none.

12. I was called into a meeting specifically to discuss my personal social media posts advocating for a ceasefire in Palestine.

13. I have been continuously monitored (online, outside of work and at work) and accused of bias without basis, whereas non-Palestinian, non-Muslim and non-Arab educators have not been subjected to such invasive oversight or baseless accusations.

14. In February 2024, Dr. McMahon made a shocking statement during a discussion about Palestinian advocacy: "*If you people are free, you would cause another Holocaust.*"

15. During a conversation related to the incident in which I was slandered by the librarian, I said to Eileen I am not antisemitic and I am tired of speaking to this accusation and having to prove myself innocent. She said, "*I know you are not antisemitic. If I thought you were, you would not be here.*"

16. The incident suggests a hierarchy of whose concerns are seen as legitimate or worthy of protection.

17. On November 14, 2024, a white sophomore student in a genocide studies class taught by an Algerian Muslim teacher, Amira Hattab, directed a violent, racist threat toward the teacher, saying: "*You terrorist bitch, I am going to kill you.*" A threat assessment was conducted following the incident, but the teacher was instructed to return to the classroom with the same student.

18. The teacher came to my office crying. She reported the incident to Mr. Brown (APSS). Despite clear distress, the administration returned the student to class. I, as the Department Chair, intervened, requested the student be reassigned, and faced backlash. The situation was later used to unfairly criticize my relationships outside my department.

19. I raised concerns about the teacher's safety in remaining in the same environment with the student, especially given the severity of the threat.

20. Although it was my job as the Department Chair to look out for my teachers and their safety, I was faulted for trying to support her.

21. I was made to feel as though it was not okay to advocate for Arab/Muslim teachers.

22. Due to continuing tensions at the school, I was called into numerous meetings during work hours and during the time when I was supposed to be doing other things as part of my job as the Department Chair. I had no support and was denied having an advocate every time. This hindered my ability to do my job properly.

23. Dr. McMahon denied my concerns regarding my identity and how it affected my reputation and safety throughout my time as the Department Chair. Dr. McMahon denied that it impacted my relationship with teachers, parents and administrators, and across the district.

24. Security at other school buildings routinely asked for my ID every time I entered, unlike other staff who were not routinely asked to show their IDs. This differential treatment appeared to be because I am a visibly Muslim woman who wears a hijab and a person of color, which made me feel singled out and othered within the district.

25. Tony Tavano (Teacher at Maine West) also told me he "needed to protect his colleagues from me," implying I was a threat.

## III. ISSUE/BASIS
### A. Unfair/Disparate Treatment – May 2023 to March 2025, Religion
### B. PRIMA FACIE ALLEGATIONS

1. I am a Muslim American.

2. In May 2021, I applied for the Assistant Principal for Student Support (APPS) position at Maine East High School under Maine Township High School District 207.

3. I made it to the final two rounds, but Dr. Mike Pressler (School Administrator & former Principal of Maine East High School) told me that I did not get the job because I was a woman, and the after-school demand would be too much for me to handle as a single parent.

4. I later found out that Dr. Pressler also told others that he was concerned my Islamic faith would prevent me from treating LGBTQ+ students fairly.

5. At no point in my career did I discriminate against LGBTQ+ students or treat them unfairly.

6. All students were included in my literature that accurately represents them. I led the curriculum revisions as well as work through the District Equity team across all three English departments and was responsible for revising the literature to make sure it was inclusive.

7. In 2023, I was approached by three people in the district to apply for the English Department Chair position at Maine West High School under Maine Township High School District 207. Dr. McMahon was one of the people who approached me for this position.

8. I was hired on May 2, 2023, as the English Department Chair at Maine West High School for the 2023-24 school year which starts in August.

9. I noticed early on that there existed a clear pattern of discriminatory behavior at Maine West High School, under Maine Township High School District 207.

10. I consistently received positive reviews for my performance at Maine West High School until I was targeted due to my race.

11. In around August 2023, I found out that an internal group had been advocating to have my contract revoked for three months. I was labeled as anti-Semitic before even meeting colleagues because of my longstanding advocacy and support for Palestine, as an Arab Muslim educator. This led to a culture where people physically moved away from me at meetings and Institute Days, reinforcing an isolating and discriminatory environment.

12. Since October 2023, I have been subjected to heightened scrutiny regarding my social media presence, professional decisions, and ability to evaluate Jewish colleagues, even though there was no evidence to warrant the same.

13. Dr. McMahon, the principal, questioned how I could evaluate Jewish teachers fairly because of the concerns raised by the Union.

14. In October 2023, administrators investigated my social media posts for anti-Semitic content, even though they admitted there were none.

15. I was called into a meeting specifically to discuss my personal social media posts advocating for a ceasefire in Palestine.

16. I have been continuously monitored (online, outside of work and at work) and accused of bias without basis, whereas non-Palestinian, non-Muslim and non-Arab educators have not been subjected to such invasive oversight or baseless accusations.

17. In February 2024, Dr. McMahon made a shocking statement during a discussion about Palestinian advocacy: "If you people are free, you would cause another Holocaust."

18. During a conversation related to the incident in which I was slandered by the librarian, I said to Eileen I am not antisemitic and I am tired of speaking to this accusation and having to prove myself innocent. She said, "I know you are not antisemitic. If I thought you were, you would not be here."

19. The incident suggests a hierarchy of whose concerns are seen as legitimate or worthy of protection.

20. On November 14, 2024, a white sophomore student in a genocide studies class taught by an Algerian Muslim teacher, Amira Hattab, directed a violent, racist threat toward the teacher, saying: "You terrorist bitch, I am going to kill you." A threat assessment was conducted following the incident, but the teacher was instructed to return to the classroom with the same student.

21. The teacher came to my office crying. She reported the incident to Mr. Brown (APSS). Despite clear distress, the administration returned the student to class. I, as the Department Chair, intervened, requested the student be reassigned, and faced backlash. The situation was later used to unfairly criticize my relationships outside my department.

22. I raised concerns about the teacher's safety in remaining in the same environment with the student, especially given the severity of the threat.

23. Although it was my job as the Department Chair to look out for my teachers and their safety, I was faulted for trying to support her.

24. I was made to feel as though it was not okay to advocate for Arab teachers.

25. In March 2024, I requested leave for Eid as a religious holiday. However, my request was denied because Eid was not listed on the interfaith calendar referenced in the Collective Bargaining Agreement, and I was required to use my personal sick leave. I had to advocate extensively for Eid to be recognized, and eventually, the administration made changes to the policy regarding religious holidays that were not listed on the calendar, allowing them to be recategorized as religious holidays. This initial denial was particularly concerning given that the district has a sizeable Muslim and Arab population.

26. I was called into a meeting specifically to discuss my personal social media posts advocating for a ceasefire in Palestine.

27. I have been continuously monitored (online, outside of work and at work) and accused of bias without basis, whereas non-Palestinian, non-Muslim educators have not been subjected to such invasive oversight or baseless accusations.

28. In February 2024, Dr. McMahon made a shocking statement during a discussion about Palestinian advocacy: "*If you people are free, you would cause another Holocaust*."

29. During a conversation related to the incident in which I was slandered by the librarian, I said to Eileen I am not antisemitic and I am tired of speaking to this accusation and having to prove myself innocent. She said, "*I know you are not antisemitic. If I thought you were, you would not be here.*"

30. The incident suggests a hierarchy of whose concerns are seen as legitimate or worthy of protection.


**IV. ISSUE/BASIS**

**A. Discrimination based on Gender, Family Status and Religion, in Hiring –** May 2021, Single Woman and Muslim

**B. PRIMA FACIE ALLEGATIONS**

1. I am a Palestinian American Muslim.

2. I applied for the Assistant Principal for Student Support (APPS) position at Maine East High School under Maine Township High School District 207.

3. I made it to the final two rounds, but Dr. Pressler told me that I did not get the job because I was a woman, and the after-school demand would be too much for me to handle as a single parent.

4.  I later found out that Dr. Pressler also told others that he was concerned my Islamic faith would prevent me from treating LGBTQ+ students fairly.

## III. ISSUE/BASIS
**A. Hostile Work Environment –** 2023 to 2025, National Origin, Ancestry, Race, and Religion
## B. PRIMA FACIE ALLEGATIONS

1.  I am an Arab Palestinian American Muslim woman.
2.  From 2022-2023, BIPOC teachers, including two I hired, faced significant challenges due to their identities. Many BIPOC staff members at Maine West share these concerns but fear speaking out.
3.  During my own job application process, I was repeatedly warned, "Don't get on Eileen's (Dr. McMahon) bad side."
4.  Unfortunately, not too long after I started my work, I encountered hostility and barriers rooted in bias rather than merit.
5.  Between 2022-24, three teachers of color left the English department, one after filing a grievance.  Numerous administrators of color either left or were pushed out.
6.  Dr. McMahon verbally attacked a Black educator in a district equity meeting, leading to her ban from district-wide equity meetings. She is the only principal in the district not allowed to attend district equity meetings because of her actions toward people of color.
7.  This pattern reflects a hostile work environment and systemic bias where BIPOC educators face exclusion, retaliation, and intimidation.
8.  In April 2023, I was informed that my team was "difficult" and "resistant to change." Despite this, I was tasked with overhauling the curriculum while facing resistance from teachers and administration.
9.  It became very clear to me that some of my team members are racist because they were a part of the group lobbying to get me fired, before I even started, based on my identity.
10. I was labeled as "divisive" despite implementing team-building practices later adopted by the administration. Resistance to curriculum changes was unfairly attributed to me rather than systemic issues.
11. Todd Ruder, a teacher in my department, verbally assaulted me in a department meeting in 2024 and this was reported by other teachers and to admin by me. No conversation or support followed.  It was left to me to organize a restorative circle to address the issue.  Todd continued to use his union position to work against me all year spreading rumors and starting problems.
12. In May 2023, I requested time off during administration week to accompany my husband to Jordan, explaining to Dr. McMahon that I would work all summer, unpaid, to support my team. She initially approved but later claimed it was beyond her authority and directed me to Dr. Dagres.
13. Mr. Dagres and I had a positive discussion; I explained my father's terminal illness and my commitment to remaining engaged. He agreed to grant the time off but needed to check with

Eileen. Later, he texted me, stating my request was denied. When I followed up, he revealed that Eileen had blocked it, contradicting her prior approval. He was surprised by her inconsistency and ultimately approved my request via email.

14. This reflects a pattern of unfair and arbitrary treatment, creating a hostile work environment.

15. On the first day of school, on August 14, 2024, Dr. McMahon apologized for not being in a good place mentally last school year and for taking it out on people. She said she would be different this year. She admitted to being an emotional leader.

16. In August 2023, I was informed that an internal group was working with an external group who had been advocating to have my contract revoked for three months in the Summer. I was labeled as anti-Semitic before even meeting colleagues. This led to a culture where people physically moved away from me at meetings and Institute Days, reinforcing an isolating and discriminatory environment.

17. When I brought this up to Dr. McMahon so we can problem solve in our administrative meeting. She refused because she thought it would make me look weak as the new Department Chair. Nothing was done after that. She kept telling me this would go away even though it continued to get more aggressive and included more people district-wide, as it did.

18. In August 2024, after my relationship broke with her because of her holocaust comment, despite my efforts to repair our working relationship, Dr. McMahon dismissed tensions and ignored my hardships, including identity-based attacks by parents, staff and even herself. She and the school failed to provide support or initiate restoration.

19. After the Chicago Jewish Alliance (CJA) doxed me and other internal groups/parents created pressure, the issues that arose after marked a turning point in how I was treated. Prior to this, my advocacy for Palestine was never identified as a performance issue. It was only after external political pressure and public misrepresentation of my identity and speech that the administration began to scrutinize and penalize my actions, suggesting a reactive and discriminatory shift.

20. Dr. McMahon repeatedly undermined my authority. She changed department decisions I made (e.g., curriculum representative selections) without informing me and discussed staff concerns about me directly with teachers. She also made inappropriate comments during a department PLT meeting, joking with resistant staff that she wouldn't believe "the shit" about them if they didn't believe "the shit" about her.

21. On November 14, 2024, Amira Hattab, a teacher within my department, came to my office crying after a student told her, "*I am going to kill you, you terrorist bitch*" during a genocide studies unit that included Palestine. Despite reporting the threat, she was told to return to class. The school psychologist, Lynn Perri, disagreed with that decision and recommended Ms. Hattab to come to me. In response, I contacted the Assistant Principal for Student Support (APSS), Mr. Henry D. Brown, and recommended the student be moved to another class because of the concerns raised by Ms. Hattab. Mr. Brown downplayed the situation and made it seem like he and Ms. Hattab reached a positive outcome. My email was described as

coming "out of left field," and this was later cited as evidence that I had difficulty maintaining relationships outside of my department.

22. On January 6, 2025, CJA publicly accused me of anti-Semitism due to my Palestinian identity and educational curriculum. Their false claims were amplified at a school board meeting.

23. When I was hired, Dr. McMahon and Mr. Dagres agreed that I could continue my public speaking as part of my advocacy. They said the district would support it and approve the time and costs. Dr. McMahon said she would not include it in the contract so I would not be limited to a set number of days. Since January 6, 2025, she has denied all of my public speaking requests.

24. On January 7, 2025, the day after these public accusations, I was called into a meeting with Dr. McMahon and subjected to negative performance feedback despite prior positive evaluations and no prior feedback or coaching regarding poor performance. At the end of the meeting, I asked if this meant my employment was at risk, she stated, "*I have a decision to make but I do not think you are a fit here.*"

25. This timing suggests that the school district's actions were influenced by external discriminatory rhetoric. Since that meeting with no due process, Dr. McMahon has not offered support. I was offered a mentor one week before a decision about my employment was to be made by the board.

26. As part of the increasingly hostile work environment, I was also denied access to professional development opportunities that had been agreed upon prior to the escalation of these issues in January 2025. This further limited my ability to grow in my role and contributed to the sense that I was being excluded and isolated professionally due to my identity and advocacy.

27. Throughout January 2025, I tried to set up meetings to de-escalate and resolve issues around the doxing I faced, the issues at the school and district level, and come to a positive resolution. Many of my requests to meet and discuss were ignored or denied. I was encouraged to speak to Dr. McMahon even though we had existing tensions.

28. In the end of February 2025, I filed an informal grievance complaint under the Uniform Grievance Procedure. Despite raising serious concerns, no resolution or meaningful action resulted from the complaint.

29. I was consistently treated as an outsider. Teachers in my department said they liked me as a leader but not what I "stood for." One teacher said the department started to decline after the arrival of Aime Perez, Noor Alkhawja, and Amira Hattab, all teachers of color. Even security at other school buildings routinely asked for my ID, unlike other staff. Tony Tavano (Teacher at Maine West) told me he "needed to protect his colleagues from me," implying I was a threat.

30. Other educators within the district who are not Palestinian, Arab, or Muslim have not been subjected to public smear campaigns and have not faced immediate adverse employment actions following external criticism.

31. The cumulative actions of Dr. McMahon, the administration, and a select group of teachers reflect a sustained pattern of exclusion, retaliation, and differential treatment that created a hostile work environment.

## V. ISSUE/BASIS
**A. Retaliation –** January 2025 to February 2025
## B. PRIMA FACIE ALLEGATIONS

1. I am a Palestinian American Muslim woman.

2. I have performed my job duties in a satisfactory manner. My previous performance evaluations before January 2025 were positive.

3. I experienced retaliation for engaging in protected activity under both the Illinois Human Rights Act and the First Amendment. My advocacy for Palestine, my expressions on social media calling for a ceasefire, and my support for Muslim and Arab educators are all forms of constitutionally protected speech and association.

4. Many BIPOC staff members at Maine West shared concerns of bias and discrimination but feared the repercussions of speaking out.

5. In around 2022-2023, during my own job application process, I was repeatedly warned, "Don't get on Eileen's (Dr. McMahon) bad side."

6. Throughout my time at Maine West, Dr. McMahon and I had multiple discussions in which she made offensive, incorrect and discriminatory remarks due to my Palestinian identity and we had disagreements due to that.

7. On January 7, 2025, the day after I was falsely accused of being antisemitic due to my Palestinian identity and my curriculum, I was called into a meeting with Dr. McMahon and subjected to negative performance feedback despite prior positive evaluations and no prior feedback or coaching regarding poor performance.

8. At the end of the meeting, I asked if this meant my employment was at risk, she stated, "*I have a decision to make but I do not think you are a fit here.*"

9. This timing suggests that the school district and Dr. McMahon's actions were influenced by external discriminatory rhetoric and were a direct response to my advocacy for Palestinians.

10. I received an email for mishandling the STAR test, even though another department chair who failed to administer it was granted an extension. It was previously not an issue until later in January, after the false accusations, rising tensions, and doxing by external groups. I explained the circumstances that prevented me from administering the STAR test to the 11th grade students. The process itself was confusing for many of those responsible for administering the test, and there was also uncertainty about whether the test was mandatory. There was widespread confusion among staff about the STAR test. Dr. Dagres dismissed the context, saying each incident would be viewed in isolation.

11. My advocacy for Palestine, including educational content and personal expression, was never raised as a concern in my performance reviews or interactions until after external

pressure began to mount, particularly from outside organizations such as the Chicago Jewish Alliance (CJA). It became clear that my identity and views only became an issue once outside entities began applying pressure on the district, influencing its internal actions toward me.

12. I was also denied access to professional development opportunities that had previously been approved or discussed. This shift occurred after I began raising concerns and asserting my rights in January 2025, further contributing to a pattern of retaliation and professional isolation.

13. On February 7, 2025, I met with Dr. Tatiana Bonuma (Superintendent of Maine Township High School District 207) and Mr. Dagres to inform them of my intent to file a formal grievance due to the ongoing discrimination and lack of support I had experienced. During this meeting, I shared several of my concerns, explaining that I had made every effort to resolve the issues internally, but the problems only escalated. When Dr. Bonuma asked about the purpose of the grievance, I responded that I felt I had no other recourse. She acknowledged that filing a grievance was my right but also characterized it as the "end of the road." She then suggested that if I gave her and Mr. Dagres a few days to process, they might be able to "think of a creative solution," noting that the administration was currently busy with sectioning. This response gave the impression that exercising my right to file a grievance was being viewed negatively and implicitly discouraged.

14. On February 20, 2025, I was issued a formal reprimand. The reprimand was delivered by Mr. Dagres based on an investigation led by Dr. McMahon in which several people who were questioned reported that she asked leading questions and misrepresented what they said. The reprimand was issued shortly after I expressed my intent to file a grievance on February 13, 2025.

15. This reinforced the pattern of retaliation I experienced whenever I raised concerns or asserted my rights.

16. Similarly situated employees who are not Persons of Color, Palestinian, Arab, or Muslim have not been subjected to comparable scrutiny or disciplinary actions after filing grievances.

## VI. ISSUE/BASIS

**A. Failure to Promote –** January to February 2025, based on National Origin/Ancestry, Religion, and Race

## B. PRIMA FACIE ALLEGATIONS

1. I am a Palestinian American Muslim woman who wears the hijab.
2. On February 20, 2025, I applied for the Associate Principal for Teaching and Learning (APTL) position at Maine East High School under Maine Township High School District 207.

3. I was the only applicant with a doctorate in the field and extensive accolades that aligned directly with the APTL role, yet I was not selected.

4. The individual ultimately chosen for the position did not have comparable qualifications.

5. Mr. Dagres served on the interview panel for the position, along with Dr. Rachel Abel, who is closely aligned with Dr. McMahon. Mr. Dagres was involved in all district-level discussions related to concerns I raised at Maine West High School and authored the letter that misrepresented both the letter-writing incident and the STAR test situation.

6. The interview panel included Mr. George Dagres; Rachel Abel, Associate Principal Teaching & Learning at Maine West High School; Melissa Pikul, Principal of Maine East High School; Dr. Jill Geocaris, Director of Professional Development for District 207; Melissa Dudich, Associate Principal for Teaching and Learning at Maine South High School; and the CTE and Fine Arts Department Chairs from Maine East. Many of these individuals were either involved in prior or later adverse decisions against me or were already aware of the challenges I faced at Maine West High School, raising concerns about impartiality in the promotion process.

7. The decision not to promote me, despite my stellar qualifications and strong performance, appears to have been influenced by unlawful bias, discrimination and past incidents at Maine West High School.



# State of Illinois
# Department of Human Rights

dhr.illinois.gov

May 22, 2025

Sawsan Jaber
C/O: Heena Musabji
Council on American-Islamic Relations, Chicago Chapter (CAIR-Chicago)
17 N State St., Suite 1500
Chicago, IL 60602

RE:  Charge No.:  2025CF1836
     Respondent: Maine Township High School District 207

**Complaint or Civil Action Filing Dates:** 4/7/2026  **through**  7/6/2026

Dear Complainant:

You have filed a discrimination charge under the Human Rights Act. A copy of the charge has been served on the Respondent. Keep this letter for reference if you need to telephone the Illinois Department of Human Rights ('IDHR'). If there is an 'A', 'E', or 'F' in your charge number, we are enclosing an important notice from the Federal Equal Employment Opportunity Commission ('EEOC') because your charge has been automatically filed with that agency.

You are required to preserve and maintain all records, including paper, electronic, or other formats, pertaining to this charge.

If IDHR schedules a fact-finding conference, you will be advised of the date. It is your responsibility to cooperate with IDHR's investigation and provide all pertinent information you have concerning the case by the dates requested.

You have the right to file a complaint with the Human Rights Commission or commence a civil action in the appropriate circuit court if IDHR has not completed your case by issuing its report of findings within 365 days from the date you filed your PERFECTED signed and notarized charge or within any extension of that time to which you and the Respondent have agreed in writing.

Within 90 days of the expiration of the 365 days or extension (see above paragraph), if you choose, you may file a complaint with the Human Rights Commission or commence a civil action in the appropriate circuit court. We have calculated the time above (see Complaint or Civil Action Filing Dates). While we have made this calculation with the best of intentions, errors can occur. The Commission has ruled that it is your responsibility to count the number of days properly. If you file a complaint or commence a civil action in circuit court outside of this 90-day period, the Commission may dismiss your complaint; or, your civil action may be deemed untimely.

Once 455 days (or the extended time) have passed, IDHR must dismiss your charge with prejudice without any further right to proceed if you have not filed a complaint with the Commission or commenced a civil action in the appropriate circuit court. Therefore, you may wish to contact an attorney to decide the best way for you to handle your case. If you file a complaint with the Human Rights Commission, the form of the complaint must be in accordance with Section (7A-102(F) of the Human Rights Act. You must serve a copy of the complaint filed with the Commission on IDHR, on the same day that you file a complaint with the Commission. The Commission will then schedule a hearing for your case before an Administrative Law Judge. If you commence a civil action in a circuit court, the form of the complaint must be in accordance with the Illinois Code of Civil Procedure. If you file a complaint with the Human Rights Commission, you may not later commence a civil action in circuit court.

You must advise IDHR of all changes of name, address, or telephone numbers. If you do not do so, IDHR may dismiss your case if it cannot locate you.

1509-0059 IN-6 NON-MED
Rev. 04/25

| CHARGE OF DISCRIMINATION | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974: See Privacy act statement before completing this form. <br><br> #   250520047 | ☒ IDHR <br><br> ☐ EEOC | |

**Illinois Department of Human Rights and EEOC**

| NAME OF COMPLAINANT (indicate Mr. Ms. Mrs.) | | TELEPHONE NUMBER (include area code) |
|---|---|---|
| Mrs. Sawsan Jaber | | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| | | |
| | | MM / DD / YYYY |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (IF MORE THAN ONE LIST BELOW)

| NAME OF RESPONDENT | NUMBER OF EMPLOYEES, MEMBERS 15+ | TELEPHONE NUMBER (include area code) |
|---|---|---|
| Maine Township High School District 207 | Yes | 847-696-3600 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 1177 South Dee Road, Parkridge, IL, 60068 | | Cook |

| CAUSE OF DISCRIMINATION BASED ON: | DATE OF DISCRIMINATION EARLIEST (ADEA/EPA) LATEST (ALL) |
|---|---|
| National Origin, Ancestry, Race, Religion, Gender, Retaliation, Hostil ⊞ | March 2025 <br> ☐ CONTINUING ACTION |

THE PARTICULARS OF THE CHARGE ARE AS FOLLOWS:

**S E E   A T T A C H E D**

DEPT. OF HUMAN RIGHTS
INTAKE DIVISION

APR. 7, 2025

**RECEIVED**

BY:_____

**Page 1 of 2**

| I also want this charge filed with the EEOC.  I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that the undersigned verily believes the same to be true. [735 ILCS 5/1-109] <br><br> X _____  04/07/2025 <br> SIGNATURE OF COMPLAINANT    DATE |
|---|---|

EEO-5 FORM (Rev. 4/2022-INT)

**RETURN THIS COPY**

*2025 CF 1936*

**Sawsan Jaber IDHR Charge of Discrimination**
**<u>Charge of Discrimination</u>**

**Complainant:** Sawsan Jaber

| Complainant Contact Information: | Respondent Contact Information: |
|---|---|
| ████████ | Maine Township High School District 207 |
| | 1177 South Dee Road, Parkridge, IL, 60068 |
| | Phone: 847-696-3600 |
| | Maine West High School |
| | 1755 S Wolf Rd, |
| | Des Plaines, IL 60018 |
| | Phone: 847-827-6176 |

## I. ISSUE/BASIS

**A. Unfair/Disparate Treatment** – May 2023 to March 2025, National Origin/Ancestry

**B. PRIMA FACIE ALLEGATIONS**

1. I am a Palestinian American.
2. I was hired on May 2, 2023, as the English Department Chair at Maine West High School.
3. There exists a clear pattern of discriminatory behavior at Maine West High School, under Maine Township High School District 207.
4. In around 2022-23, three teachers of color were pushed out of the English department for different reasons, one filed a grievance because she was not promoted (Department Chair Position) due to her race (Nicole Beyers-Black Latina), before leaving. Another left in 2023-24 because she was discriminated against because of her race and was unsupported by Dr. McMahon. The teachers who left other than Ms. Beyers were Aime Perez and Emily Deleon. They all moved to Maine East High School under the same school district.
5. Around the same time, Dr. Eileen McMahon (Principal of Maine West High School and Direct Supervisor) verbally attacked a black educator (Nicole Beyers) in a district equity meeting and was banned from future meetings. She is the only principal in the district not allowed to attend district equity meetings because of her actions toward people of color.
6. When the district confirmed my position, there were efforts led by a social science teacher to get me fired. Teachers from my department were at these board meetings trying to get me fired. They accused me of being anti-Semitic because of my Palestinian identity and advocacy. Dr. Christina Ramirez can confirm this. She was really upset about how I was informed and how Eileen minimized the whole attack. Eileen confirmed this one day before I started my work in August.
7. In around August 2023, I found out that an internal group of teachers (working with an outside organization) had been advocating to have my contract revoked for three months. I was labeled as anti-Semitic before even meeting colleagues due to my visible support and advocacy for

Palestine. This led to a culture where people physically moved away from me at meetings and Institute Days, reinforcing an isolating and discriminatory environment.

8. Since October 2023, I have been subjected to heightened scrutiny regarding my social media presence, professional decisions, and ability to evaluate Jewish colleagues, even though there was no evidence to warrant the same.

9. Dr. McMahon questioned how I could evaluate Jewish teachers fairly because of the concerns raised by the Union.

10. In October 2023, administrators investigated my social media posts for anti-Semitic content, even though they admitted there were none.

11. Around the same time, I was called into several meetings specifically to discuss my personal social media posts advocating for a ceasefire in Palestine. They checked my social media posts and did not find them problematic.

12. My wearing of a Palestinian beanie was deemed inappropriate and offensive by one of my department teachers, and I was told that it made my colleagues "uncomfortable," while similar cultural expressions by non-Palestinian colleagues were not scrutinized. As a person of Palestinian ancestry and origin, I was told that wearing a Palestinian beanie was inappropriate for someone in an administrative role and that I was misusing my authority by displaying it. The same teacher questioned whether I would be comfortable if she wore a Star of David, to which I responded yes, affirming my support for expressions of cultural and religious identity across all communities.

13. I have been continuously monitored and accused of bias and investigated publically, injuring my professional credibility and authority without basis, whereas non-Palestinian, non-Muslim educators or administrators have not been subjected to such invasive oversight or baseless accusations.

14. I was accused of hiring "my people" after two Arab teachers, Noor Alkhawja and Amira Hattab, were selected. However, the hiring process involved a team of 12 individuals and 5 rounds of the selection process with the involvement of at least 8 other district administrators, and the final decision was not mine alone. Out of approximately 250 applicants, 36 were interviewed. Both Ms. Alkhawja and Ms. Hattab ranked in the top five candidates based on team evaluations, with Ms. Hattab unanimously ranked as the number one choice.

15. I consistently received positive reviews for my performance at Maine West High School until January 07, 2024, due to the increasing pushback from both within the department and external sources, in response to my advocacy for Palestine.

16. In February 2024, Dr. McMahon made a shocking statement during a discussion about Palestinian advocacy: "*If you people are free, you would cause another Holocaust.*"

17. The school's sudden concern with my views on Palestine appeared to be driven not by any internal misconduct, but by growing external pressure, particularly from advocacy groups and community members reacting to my identity and advocacy work.

18. On April 26, 2024, Todd Ruder, a white male teacher in my department, yelled "You are hiring your people" in reference to the hiring of two Arab teachers for the upcoming school year



beginning in August. I reported this discriminatory remark to Dr. McMahon and Dr. Jen Loika.

19. When I was provided with no support to deal with this situation, I decided to plan a restorative circle with Dr. Payne and my whole team. My team refused to participate by agreeing to stay quiet during the circle, hindering its possible impact.

20. In August 2024, when the two new teachers of color, Amira Hattab and Noor Alkhawja, joined, they were targeted by my department. Other staff members of color in the department, including Alejandro Gonzales, a teaching assistant, were targeted by my department. Teachers made explicit statements that we did have problems until people of color joined.

21. In October 2024, I spoke at the Courageous Conversations Summit, presenting a session on Palestine. Maine West's librarian (Nicole Coover-Thompson) attended the session as well and she came back and started a rumor districtwide using the Teacher's Union as a mechanism that I made antisemitic comments in my session, even though I did not.

22. The next morning, Ms. Coover-Thompson admitted she lied in front of the administrators. However, the district continued an investigation for three months. I was cleared, but nothing was done to restore my reputation, and no formal apology was issued.

23. She is still employed and is a part of the department, without any accountability for lying and spreading rumors about me. I had to continue working with her despite continually asking for boundaries or some type of intervention.

24. The investigation conducted by Mr. George Dagres, Assistant Superintendent of Human Resources at Maine Township High School District 207, concluded that the allegations against Ms. Coover-Thompson were unfounded. Following the investigation, the district failed to take any steps to hold Ms. Thompson accountable.

25. Ms. Thompson filed a formal grievance and brought a discrimination case to the Teachers Union. That is how the district got involved. I had no support from the Union since my position does not allow me to be a part of the Union. I also had no support from administrators and spent hours of time during work hours answering questions regarding the false accusations.

26. The real reason she filed the grievance was the curriculum change, which made The Night optional and included Palestinian content among the choice novels. Someone from the department tipped off and provided an extremist organization of this curricular change and misrepresented the information leading to a public attack on me on social media and in the district.

27. In November 2024, after I raised concerns and asked Dr. McMahon to address the librarian's anti-Palestinian slander, including her false accusation that I was antisemitic for sharing my lived experience about Palestine and her attempts to have me fired, Dr. McMahon falsely claimed that I had demanded the librarian's termination. Instead of addressing the harm caused, Dr. McMahon offered a restorative circle with the very person who had exhibited anti-Palestinian behavior.

28. During the conversation about holding Ms. Thompson accountable, I said to Dr. McMahon I am not antisemitic and I am tired of speaking to this accusation and having to prove myself



innocent. She said, "*I know you are not antisemitic. If I thought you were, you would not be here.*"

29. The incident suggests a hierarchy of whose concerns are seen as legitimate or worthy of protection.

30. Meanwhile, continued baseless accusations of anti-Semitism led to excessive scrutiny of my pro-Palestine activities both inside and outside the school, exposing a clear double standard in how discrimination is addressed.

31. On November 14, 2024, a white sophomore student in a genocide studies class taught by an Algerian teacher, directed a violent, racist threat toward the teacher, saying: "*You terrorist bitch, I am going to kill you.*" A threat assessment was conducted following the incident, but the teacher was instructed to return to the classroom with the same student.

32. I raised concerns about the teacher's safety in remaining in the same environment with the student, especially given the severity of the threat. I emphasized that her safety should not be compromised or left to chance in hopes the situation wouldn't escalate. I was made to feel as though it was not okay to advocate for Arab teachers and it was not a valid threat.

33. Their resolution was that he did not have access to a gun and that I was elevated (intense) in dealing with the situation.

34. In contrast, when there was a "rumor" about a school shooting threat in May 2023, there was chaos and teachers jumped out of the windows. Somehow the school shooting alarm went off. That situation was taken very seriously by the school. That incident, based on far less concrete information, was taken extremely seriously by the administration.

35. For the majority of my time as Department Chair, I was constantly being pulled into investigations, consuming much of my day and making it difficult to carry out my actual responsibilities.

36. Tony Tavano (Teacher at Maine West) also told me he "needed to protect his colleagues from me," implying I was a threat.

## II. ISSUE/BASIS

### A. Unfair/Disparate Treatment – May 2023 to March 2025, Race

### B. PRIMA FACIE ALLEGATIONS

1. I am an Arab American.

2. In 2023, I was approached by three people in the district to apply for the English Department Chair position at Maine West High School under Maine Township High School District 207. Dr. McMahon was one of the people who approached me for this position.

3. I was hired on May 2, 2023, as the English Department Chair at Maine West High School for the 2023-24 school year which starts in August.

4. There existed a clear pattern of discriminatory behavior at Maine West High School, under Maine Township High School District 207.

5. In around 2022-23, three teachers of color were pushed out of the English department for different reasons, one filed a grievance because she was not promoted (Department Chair

*205 of 193*

Position) due to her race (Nicole Beyers-Black Latina), before leaving. Another left in 2023-24 because she was discriminated against because of her race and was unsupported by Dr. McMahon. The teachers who left other than Ms. Beyers were Aime Perez and Emily Deleon. They all moved to Maine East High School under the same school district.

6. Around the same time, Dr. Eileen McMahon (Principal of Maine West High School and Direct Supervisor) verbally attacked a black educator (Nicole Beyers) in a district equity meeting and was banned from future meetings. She is the only principal in the district not allowed to attend district equity meetings because of her actions toward people of color.

7. I consistently received positive reviews for my performance at Maine West High School until I was targeted due to my race.

8. In around August 2023, I found out that an internal group had been advocating to have my contract revoked for three months. I was labeled as anti-Semitic before even meeting colleagues because of my longstanding advocacy and support for Palestine, as an Arab Muslim educator. This led to a culture where people physically moved away from me at meetings and Institute Days, reinforcing an isolating and discriminatory environment.

9. Since October 2023, I have been subjected to heightened scrutiny regarding my social media presence, professional decisions, and ability to evaluate Jewish colleagues, even though there was no evidence to warrant the same.

10. Dr. McMahon, the principal, questioned how I could evaluate Jewish teachers fairly because of the concerns raised by the Union.

11. In October 2023, administrators investigated my social media posts for anti-Semitic content, even though they admitted there were none.

12. I was called into a meeting specifically to discuss my personal social media posts advocating for a ceasefire in Palestine.

13. I have been continuously monitored (online, outside of work and at work) and accused of bias without basis, whereas non-Palestinian, non-Muslim and non-Arab educators have not been subjected to such invasive oversight or baseless accusations.

14. In February 2024, Dr. McMahon made a shocking statement during a discussion about Palestinian advocacy: *"If you people are free, you would cause another Holocaust."*

15. During a conversation related to the incident in which I was slandered by the librarian, I said to Eileen I am not antisemitic and I am tired of speaking to this accusation and having to prove myself innocent. She said, *"I know you are not antisemitic. If I thought you were, you would not be here."*

16. The incident suggests a hierarchy of whose concerns are seen as legitimate or worthy of protection.

17. On November 14, 2024, a white sophomore student in a genocide studies class taught by an Algerian Muslim teacher, Amira Hattab, directed a violent, racist threat toward the teacher, saying: *"You terrorist bitch, I am going to kill you."* A threat assessment was conducted following the incident, but the teacher was instructed to return to the classroom with the same student.

2025 OF 1836

18. The teacher came to my office crying. She reported the incident to Mr. Brown (APSS). Despite clear distress, the administration returned the student to class. I, as the Department Chair, intervened, requested the student be reassigned, and faced backlash. The situation was later used to unfairly criticize my relationships outside my department.

19. I raised concerns about the teacher's safety in remaining in the same environment with the student, especially given the severity of the threat.

20. Although it was my job as the Department Chair to look out for my teachers and their safety, I was faulted for trying to support her.

21. I was made to feel as though it was not okay to advocate for Arab/Muslim teachers.

22. Due to continuing tensions at the school, I was called into numerous meetings during work hours and during the time when I was supposed to be doing other things as part of my job as the Department Chair. I had no support and was denied having an advocate every time. This hindered my ability to do my job properly.

23. Dr. McMahon denied my concerns regarding my identity and how it affected my reputation and safety throughout my time as the Department Chair. Dr. McMahon denied that it impacted my relationship with teachers, parents and administrators, and across the district.

24. Security at other school buildings routinely asked for my ID every time I entered, unlike other staff who were not routinely asked to show their IDs. This differential treatment appeared to be because I am a visibly Muslim woman who wears a hijab and a person of color, which made me feel singled out and othered within the district.

25. Tony Tavano (Teacher at Maine West) also told me he "needed to protect his colleagues from me," implying I was a threat.

## III. ISSUE/BASIS

### A. Unfair/Disparate Treatment – May 2023 to March 2025, Religion

### B. PRIMA FACIE ALLEGATIONS

1. I am a Muslim American.

2. In May 2021, I applied for the Assistant Principal for Student Support (APPS) position at Maine East High School under Maine Township High School District 207.

3. I made it to the final two rounds, but Dr. Mike Pressler (School Administrator & former Principal of Maine East High School) told me that I did not get the job because I was a woman, and the after-school demand would be too much for me to handle as a single parent.

4. I later found out that Dr. Pressler also told others that he was concerned my Islamic faith would prevent me from treating LGBTQ+ students fairly.

5. At no point in my career did I discriminate against LGBTQ+ students or treat them unfairly.

6. All students were included in my literature that accurately represents them. I led the curriculum revisions as well as work through the District Equity team across all three English departments and was responsible for revising the literature to make sure it was inclusive.



7. In 2023, I was approached by three people in the district to apply for the English Department Chair position at Maine West High School under Maine Township High School District 207. Dr. McMahon was one of the people who approached me for this position.

8. I was hired on May 2, 2023, as the English Department Chair at Maine West High School for the 2023-24 school year which starts in August.

9. I noticed early on that there existed a clear pattern of discriminatory behavior at Maine West High School, under Maine Township High School District 207.

10. I consistently received positive reviews for my performance at Maine West High School until I was targeted due to my race.

11. In around August 2023, I found out that an internal group had been advocating to have my contract revoked for three months. I was labeled as anti-Semitic before even meeting colleagues because of my longstanding advocacy and support for Palestine, as an Arab Muslim educator. This led to a culture where people physically moved away from me at meetings and Institute Days, reinforcing an isolating and discriminatory environment.

12. Since October 2023, I have been subjected to heightened scrutiny regarding my social media presence, professional decisions, and ability to evaluate Jewish colleagues, even though there was no evidence to warrant the same.

13. Dr. McMahon, the principal, questioned how I could evaluate Jewish teachers fairly because of the concerns raised by the Union.

14. In October 2023, administrators investigated my social media posts for anti-Semitic content, even though they admitted there were none.

15. I was called into a meeting specifically to discuss my personal social media posts advocating for a ceasefire in Palestine.

16. I have been continuously monitored (online, outside of work and at work) and accused of bias without basis, whereas non-Palestinian, non-Muslim and non-Arab educators have not been subjected to such invasive oversight or baseless accusations.

17. In February 2024, Dr. McMahon made a shocking statement during a discussion about Palestinian advocacy: "If you people are free, you would cause another Holocaust."

18. During a conversation related to the incident in which I was slandered by the librarian, I said to Eileen I am not antisemitic and I am tired of speaking to this accusation and having to prove myself innocent. She said, "I know you are not antisemitic. If I thought you were, you would not be here."

19. The incident suggests a hierarchy of whose concerns are seen as legitimate or worthy of protection.

20. On November 14, 2024, a white sophomore student in a genocide studies class taught by an Algerian Muslim teacher, Amira Hattab, directed a violent, racist threat toward the teacher, saying: "You terrorist bitch, I am going to kill you." A threat assessment was conducted following the incident, but the teacher was instructed to return to the classroom with the same student.

2025 0*1*36

21. The teacher came to my office crying. She reported the incident to Mr. Brown (APSS). Despite clear distress, the administration returned the student to class. I, as the Department Chair, intervened, requested the student be reassigned, and faced backlash. The situation was later used to unfairly criticize my relationships outside my department.

22. I raised concerns about the teacher's safety in remaining in the same environment with the student, especially given the severity of the threat.

23. Although it was my job as the Department Chair to look out for my teachers and their safety, I was faulted for trying to support her.

24. I was made to feel as though it was not okay to advocate for Arab teachers.

25. In March 2024, I requested leave for Eid as a religious holiday. However, my request was denied because Eid was not listed on the interfaith calendar referenced in the Collective Bargaining Agreement, and I was required to use my personal sick leave. I had to advocate extensively for Eid to be recognized, and eventually, the administration made changes to the policy regarding religious holidays that were not listed on the calendar, allowing them to be recategorized as religious holidays. This initial denial was particularly concerning given that the district has a sizeable Muslim and Arab population.

26. I was called into a meeting specifically to discuss my personal social media posts advocating for a ceasefire in Palestine.

27. I have been continuously monitored (online, outside of work and at work) and accused of bias without basis, whereas non-Palestinian, non-Muslim educators have not been subjected to such invasive oversight or baseless accusations.

28. In February 2024, Dr. McMahon made a shocking statement during a discussion about Palestinian advocacy: "*If you people are free, you would cause another Holocaust.*"

29. During a conversation related to the incident in which I was slandered by the librarian, I said to Eileen I am not antisemitic and I am tired of speaking to this accusation and having to prove myself innocent. She said, "*I know you are not antisemitic. If I thought you were, you would not be here.*"

30. The incident suggests a hierarchy of whose concerns are seen as legitimate or worthy of protection.

## IV. ISSUE/BASIS

**A. Discrimination based on Gender, Family Status and Religion, in Hiring** – May 2021, Single Woman and Muslim

## B. PRIMA FACIE ALLEGATIONS

1. I am a Palestinian American Muslim.

2. I applied for the Assistant Principal for Student Support (APPS) position at Maine East High School under Maine Township High School District 207.

3. I made it to the final two rounds, but Dr. Pressler told me that I did not get the job because I was a woman, and the after-school demand would be too much for me to handle as a single parent.

20250422

4. I later found out that Dr. Pressler also told others that he was concerned my Islamic faith would prevent me from treating LGBTQ+ students fairly.

## III. ISSUE/BASIS

**A. Hostile Work Environment** – 2023 to 2025, National Origin, Ancestry, Race, and Religion
**B. PRIMA FACIE ALLEGATIONS**

1. I am an Arab Palestinian American Muslim woman.
2. From 2022-2023, BIPOC teachers, including two I hired, faced significant challenges due to their identities. Many BIPOC staff members at Maine West share these concerns but fear speaking out.
3. During my own job application process, I was repeatedly warned, "Don't get on Eileen's (Dr. McMahon) bad side."
4. Unfortunately, not too long after I started my work, I encountered hostility and barriers rooted in bias rather than merit.
5. Between 2022-24, three teachers of color left the English department, one after filing a grievance. Numerous administrators of color either left or were pushed out.
6. Dr. McMahon verbally attacked a Black educator in a district equity meeting, leading to her ban from district-wide equity meetings. She is the only principal in the district not allowed to attend district equity meetings because of her actions toward people of color.
7. This pattern reflects a hostile work environment and systemic bias where BIPOC educators face exclusion, retaliation, and intimidation.
8. In April 2023, I was informed that my team was "difficult" and "resistant to change." Despite this, I was tasked with overhauling the curriculum while facing resistance from teachers and administration.
9. It became very clear to me that some of my team members are racist because they were a part of the group lobbying to get me fired, before I even started, based on my identity.
10. I was labeled as "divisive" despite implementing team-building practices later adopted by the administration. Resistance to curriculum changes was unfairly attributed to me rather than systemic issues.
11. Todd Ruder, a teacher in my department, verbally assaulted me in a department meeting in 2024 and this was reported by other teachers and to admin by me. No conversation or support followed. It was left to me to organize a restorative circle to address the issue. Todd continued to use his union position to work against me all year spreading rumors and starting problems.
12. In May 2023, I requested time off during administration week to accompany my husband to Jordan, explaining to Dr. McMahon that I would work all summer, unpaid, to support my team. She initially approved but later claimed it was beyond her authority and directed me to Dr. Dagres.
13. Mr. Dagres and I had a positive discussion; I explained my father's terminal illness and my commitment to remaining engaged. He agreed to grant the time off but needed to check with



Eileen. Later, he texted me, stating my request was denied. When I followed up, he revealed that Eileen had blocked it, contradicting her prior approval. He was surprised by her inconsistency and ultimately approved my request via email.

14. This reflects a pattern of unfair and arbitrary treatment, creating a hostile work environment.

15. On the first day of school, on August 14, 2024, Dr. McMahon apologized for not being in a good place mentally last school year and for taking it out on people. She said she would be different this year. She admitted to being an emotional leader.

16. In August 2023, I was informed that an internal group was working with an external group who had been advocating to have my contract revoked for three months in the Summer. I was labeled as anti-Semitic before even meeting colleagues. This led to a culture where people physically moved away from me at meetings and Institute Days, reinforcing an isolating and discriminatory environment.

17. When I brought this up to Dr. McMahon so we can problem solve in our administrative meeting. She refused because she thought it would make me look weak as the new Department Chair. Nothing was done after that. She kept telling me this would go away even though it continued to get more aggressive and included more people district-wide, as it did.

18. In August 2024, after my relationship broke with her because of her holocaust comment, despite my efforts to repair our working relationship, Dr. McMahon dismissed tensions and ignored my hardships, including identity-based attacks by parents, staff and even herself. She and the school failed to provide support or initiate restoration.

19. After the Chicago Jewish Alliance (CJA) doxed me and other internal groups/parents created pressure, the issues that arose after marked a turning point in how I was treated. Prior to this, my advocacy for Palestine was never identified as a performance issue. It was only after external political pressure and public misrepresentation of my identity and speech that the administration began to scrutinize and penalize my actions, suggesting a reactive and discriminatory shift.

20. Dr. McMahon repeatedly undermined my authority. She changed department decisions I made (e.g., curriculum representative selections) without informing me and discussed staff concerns about me directly with teachers. She also made inappropriate comments during a department PLT meeting, joking with resistant staff that she wouldn't believe "the shit" about them if they didn't believe "the shit" about her.

21. On November 14, 2024, Amira Hattab, a teacher within my department, came to my office crying after a student told her. "*I am going to kill you, you terrorist bitch*" during a genocide studies unit that included Palestine. Despite reporting the threat, she was told to return to class. The school psychologist, Lynn Perri, disagreed with that decision and recommended Ms. Hattab to come to me. In response, I contacted the Assistant Principal for Student Support (APSS), Mr. Henry D. Brown, and recommended the student be moved to another class because of the concerns raised by Ms. Hattab. Mr. Brown downplayed the situation and made it seem like he and Ms. Hattab reached a positive outcome. My email was described as

coming "out of left field," and this was later cited as evidence that I had difficulty maintaining relationships outside of my department.

22. On January 6, 2025, CJA publicly accused me of anti-Semitism due to my Palestinian identity and educational curriculum. Their false claims were amplified at a school board meeting.

23. When I was hired, Dr. McMahon and Mr. Dagres agreed that I could continue my public speaking as part of my advocacy. They said the district would support it and approve the time and costs. Dr. McMahon said she would not include it in the contract so I would not be limited to a set number of days. Since January 6, 2025, she has denied all of my public speaking requests.

24. On January 7, 2025, the day after these public accusations, I was called into a meeting with Dr. McMahon and subjected to negative performance feedback despite prior positive evaluations and no prior feedback or coaching regarding poor performance. At the end of the meeting, I asked if this meant my employment was at risk, she stated, "*I have a decision to make but I do not think you are a fit here.*"

25. This timing suggests that the school district's actions were influenced by external discriminatory rhetoric. Since that meeting with no due process, Dr. McMahon has not offered support. I was offered a mentor one week before a decision about my employment was to be made by the board.

26. As part of the increasingly hostile work environment, I was also denied access to professional development opportunities that had been agreed upon prior to the escalation of these issues in January 2025. This further limited my ability to grow in my role and contributed to the sense that I was being excluded and isolated professionally due to my identity and advocacy.

27. Throughout January 2025, I tried to set up meetings to de-escalate and resolve issues around the doxing I faced, the issues at the school and district level, and come to a positive resolution. Many of my requests to meet and discuss were ignored or denied. I was encouraged to speak to Dr. McMahon even though we had existing tensions.

28. In the end of February 2025, I filed an informal grievance complaint under the Uniform Grievance Procedure. Despite raising serious concerns, no resolution or meaningful action resulted from the complaint.

29. I was consistently treated as an outsider. Teachers in my department said they liked me as a leader but not what I "stood for." One teacher said the department started to decline after the arrival of Aime Perez, Noor Alkhawja, and Amira Hattab, all teachers of color. Even security at other school buildings routinely asked for my ID, unlike other staff. Tony Tavano (Teacher at Maine West) told me he "needed to protect his colleagues from me," implying I was a threat.

30. Other educators within the district who are not Palestinian, Arab, or Muslim have not been subjected to public smear campaigns and have not faced immediate adverse employment actions following external criticism.



31. The cumulative actions of Dr. McMahon, the administration, and a select group of teachers reflect a sustained pattern of exclusion, retaliation, and differential treatment that created a hostile work environment.

## V. ISSUE/BASIS

**A. Retaliation** – January 2025 to February 2025

## B. PRIMA FACIE ALLEGATIONS

1. I am a Palestinian American Muslim woman.
2. I have performed my job duties in a satisfactory manner. My previous performance evaluations before January 2025 were positive.
3. I experienced retaliation for engaging in protected activity under both the Illinois Human Rights Act and the First Amendment. My advocacy for Palestine, my expressions on social media calling for a ceasefire, and my support for Muslim and Arab educators are all forms of constitutionally protected speech and association.
4. Many BIPOC staff members at Maine West shared concerns of bias and discrimination but feared the repercussions of speaking out.
5. In around 2022-2023, during my own job application process, I was repeatedly warned, "Don't get on Eileen's (Dr. McMahon) bad side."
6. Throughout my time at Maine West, Dr. McMahon and I had multiple discussions in which she made offensive, incorrect and discriminatory remarks due to my Palestinian identity and we had disagreements due to that.
7. On January 7, 2025, the day after I was falsely accused of being antisemitic due to my Palestinian identity and my curriculum, I was called into a meeting with Dr. McMahon and subjected to negative performance feedback despite prior positive evaluations and no prior feedback or coaching regarding poor performance.
8. At the end of the meeting, I asked if this meant my employment was at risk, she stated, "*I have a decision to make but I do not think you are a fit here.*"
9. This timing suggests that the school district and Dr. McMahon's actions were influenced by external discriminatory rhetoric and were a direct response to my advocacy for Palestinians.
10. I received an email for mishandling the STAR test, even though another department chair who failed to administer it was granted an extension. It was previously not an issue until later in January, after the false accusations, rising tensions, and doxing by external groups. I explained the circumstances that prevented me from administering the STAR test to the 11th grade students. The process itself was confusing for many of those responsible for administering the test, and there was also uncertainty about whether the test was mandatory. There was widespread confusion among staff about the STAR test. Dr. Dagres dismissed the context, saying each incident would be viewed in isolation.
11. My advocacy for Palestine, including educational content and personal expression, was never raised as a concern in my performance reviews or interactions until after external



pressure began to mount, particularly from outside organizations such as the Chicago Jewish Alliance (CJA). It became clear that my identity and views only became an issue once outside entities began applying pressure on the district, influencing its internal actions toward me.

12. I was also denied access to professional development opportunities that had previously been approved or discussed. This shift occurred after I began raising concerns and asserting my rights in January 2025, further contributing to a pattern of retaliation and professional isolation.

13. On February 7, 2025, I met with Dr. Tatiana Bonuma (Superintendent of Maine Township High School District 207) and Mr. Dagres to inform them of my intent to file a formal grievance due to the ongoing discrimination and lack of support I had experienced. During this meeting, I shared several of my concerns, explaining that I had made every effort to resolve the issues internally, but the problems only escalated. When Dr. Bonuma asked about the purpose of the grievance, I responded that I felt I had no other recourse. She acknowledged that filing a grievance was my right but also characterized it as the "end of the road." She then suggested that if I gave her and Mr. Dagres a few days to process, they might be able to "think of a creative solution," noting that the administration was currently busy with sectioning. This response gave the impression that exercising my right to file a grievance was being viewed negatively and implicitly discouraged.

14. On February 20, 2025, I was issued a formal reprimand. The reprimand was delivered by Mr. Dagres based on an investigation led by Dr. McMahon in which several people who were questioned reported that she asked leading questions and misrepresented what they said. The reprimand was issued shortly after I expressed my intent to file a grievance on February 13, 2025.

15. This reinforced the pattern of retaliation I experienced whenever I raised concerns or asserted my rights.

16. Similarly situated employees who are not Persons of Color, Palestinian, Arab, or Muslim have not been subjected to comparable scrutiny or disciplinary actions after filing grievances.

## VI. ISSUE/BASIS
**A. Failure to Promote** – January to February 2025, based on National Origin/Ancestry, Religion, and Race
## B. PRIMA FACIE ALLEGATIONS
1. I am a Palestinian American Muslim woman who wears the hijab.
2. On February 20, 2025, I applied for the Associate Principal for Teaching and Learning (APTL) position at Maine East High School under Maine Township High School District 207.



3. I was the only applicant with a doctorate in the field and extensive accolades that aligned directly with the APTL role, yet I was not selected.

4. The individual ultimately chosen for the position did not have comparable qualifications.

5. Mr. Dagres served on the interview panel for the position, along with Dr. Rachel Abel, who is closely aligned with Dr. McMahon. Mr. Dagres was involved in all district-level discussions related to concerns I raised at Maine West High School and authored the letter that misrepresented both the letter-writing incident and the STAR test situation.

6. The interview panel included Mr. George Dagres; Rachel Abel, Associate Principal Teaching & Learning at Maine West High School; Melissa Pikul, Principal of Maine East High School; Dr. Jill Geocaris, Director of Professional Development for District 207; Melissa Dudich, Associate Principal for Teaching and Learning at Maine South High School; and the CTE and Fine Arts Department Chairs from Maine East. Many of these individuals were either involved in prior or later adverse decisions against me or were already aware of the challenges I faced at Maine West High School, raising concerns about impartiality in the promotion process.

7. The decision not to promote me, despite my stellar qualifications and strong performance, appears to have been influenced by unlawful bias, discrimination and past incidents at Maine West High School.

STATE OF ILLINOIS
DEPARTMENT OF HUMAN RIGHTS

**DEPT. OF HUMAN RIGHTS INTAKE DIVISION**

APR. 7, 2025

IN THE MATTER OF )

)

Sawsan Jaber )

**RECEIVED**

COMPLAINANT )

BY:

)

AND ) CHARGE NO.: 2025CF1036

)

Maine Township High School District 207 ) EEOC NO.:

)

RESPONDENT )

)

# A P P E A R A N C E

Council on American-Islamic Relations, Chicago Chapter (CAIR-Chica , hereby enter the
(Name of law firm/attorney/non-attorney representative)

appearance of Sawsan Jaber
(Name of Complainant or Respondent)

and our Appearance as their attorney (or non-attorney representative), and request that copies of

all Pleadings, Orders, and other documents be served upon the undersigned for said Party in lieu

service upon the Party.

Heena Musabji
PRINT name of attorney/non-attorney representative

Council on American-Islamic Relations, Chica
Firm Name

17 N State St., Suite 1500
Address

Chicago          IL          60602
City          State          Zip Code

312-212-1520 Ext. 205
Telephone Number

hmusabji@cair.com
Email Address

Fax Number

■ By checking this box, I consent to service of all pleadings, orders, and other documents by the Department via electronic mail and understand that electronic service to this Email Address is deemed complete upon transmission.

DATED: 04/07/2025          By: _Heena Musabji_

Signature

Rev. 4/2022



# State of Illinois
# **Department of Human Rights**

dhr.illinois.gov

| Complainant: | Sawsan Jaber |
| --- | --- |
| Respondent: | Maine Township High School District 207 |
| Charge: | 2025CF1836 |

## COMPLAINANT QUESTIONNAIRE
### EMPLOYMENT

To assist IDHR in investigating your charge, please complete and return the following questionnaire to IDHR **within 30 days** of the date you received this questionnaire.

- Representation: If you are represented by an attorney, consult with your attorney prior to completing this questionnaire.
- Answers: Answer "N/A" to any question that does not apply.
  If you do not understand a question or if you are not sure of the answer to a question, you may leave the question blank and the investigator will follow up with you at a later time.
- People: For any answer that identifies a person, include name and job title.
- Documents: **Provide a copy** of any documents (such as letters, journals, emails, policies or other evidence) which relate to the charge allegations.

1. Provide information about Respondent:
   a. State the full legal name.
   b. (If employed at Respondent, as identified on your W-2 form)
   c. Address of Respondent.
   d. Describe briefly the type of work or business carried on by Respondent at this address.

2. If you applied for or were employed at Respondent:
   a. On what date did you apply at or start working for Respondent?
   b. Who interviewed or hired you?
   c. List in chronological order each position you held at the Respondent and the date you started in that position.
   d. What were the job duties in the position you held, on the date of the incident? (Include a job description, if available)
   e. Who was your immediate supervisor?
   f. Identify the policy(-ies) or practice(s) that applied to each incident.
   g. Explain what happened to you at the time of each incident.
   h. Explain each incident was or was not consistent with Respondent's policy or practice.
   i. Explain how others were treated under similar circumstances.

3.  List your witnesses. Witnesses are persons who can support or have first hand knowledge of the allegations in your charge. Witnesses are **NOT** character references. Witnesses are not contacted during the screening process. Therefore, it is very important you tell us, in detail what each witness would tell us, if contacted, during an investigation.

    Identify each witness by:
    a.  Name
    b.  Address
    c.  Telephone number
    d.  Relationship to you (co-worker, friend, relative, etc,)
    e.  What did the witness see, hear, or experience that would support any of your allegations? (Be specific about what information the witness knows and how)

4.  If Respondent notified you that an information technology program or computer-based system ("software") was used in any process related to your charge allegation(s):
    a.  On what date Respondent notified you.
    b.  Who notified you?
    c.  Identify name of the software used (if known).
    d.  Describe how the software was utilized/involved (if known).
    e.  Provide a copy of the email or correspondence notifying you of the software use.

5.  What do you want to happen as a result of filing your charge?

6.  Please provide your e-mail address, if you have one.



## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### Chicago District Office

JCK Federal Building
230 S. Dearborn
**Suite 1866 (Enforcement, Sate and Local & Hearings)**
Suite 2920 (Legal & AOR)
Chicago, IL 60604
Chicago Direct Dial: (312) 872-9777
Enforcement/File Disclosure Fax: (312) 588-1260
Website: www.eeoc.gov

IMPORTANT NOTICE. PLEASE READ CAREFULLY. KEEP THIS NOTICE WITH YOUR OTHER RECORDS OF THIS CHARGE. THIS MAY BE THE ONLY NOTIFICATION FROM EEOC.

IDHR CHARGE NUMBER:          2025CF1836          Sawsan Jaber

# EEOC NOTICE OF CHARGE FILED

You are filing a charge of employment discrimination with the Illinois Department of Human Rights (IDHR).

As a result of an agreement between the Illinois Department of Human Rights (IDHR) and the U. S. Equal Employment Opportunity Commission (EEOC), the EEOC will also have a record of IDHR's charge of discrimination.

You are encouraged to cooperate with IDHR in the investigation of your charge. The final findings and orders of that agency may be adopted by the EEOC.

IDHR will process your charge. Under section 1601.76 of EEOC's regulations, you are entitled to request that EEOC review IDHR's investigation and findings. To obtain this review, you must request it by writing to this office within 15 days of your receipt of IDHR's final findings of your case. If we do not receive such a request for a review, EEOC will likely accept IDHR's findings without any review or any other processing by EEOC.

EEOC regulations require that you notify us of any change in address and keep us informed of any prolonged absence from your current address. Your cooperation in this matter is essential.

PLEASE NOTE: BUILDING SECURITY PROCEDURES PRESENTLY IN PLACE DO NOT PERMIT ACCESS TO EEOC WITHOUT AN APPOINTMENT. IF AN APPOINTMENT IS REQUIRED, CALL (312) 869-8000 OR 1-800-669-4000.

EEOC NOTICE

# State of Illinois
# **Department of Human Rights**

dhr.illinois.gov

## IMPORTANT NOTICE TO COMPLAINANT ABOUT MEDIATION

**The Illinois Department of Human Rights is offering YOU the opportunity to participate in the IDHR Mediation Program before the charge is investigated.**

Thousands of cases have experienced the benefits of working out disputes without investigation or litigation. The IDHR MEDIATION PROGRAM lets the parties work out a settlement with the help of a trained, impartial IDHR mediator.

MEDIATION is a form of dispute resolution where parties to an IDHR charge meet in an informal atmosphere and discuss settlement options to close the IDHR charge and avoid a lengthy and possibly expensive investigation.

MEDIATION can provide a fast, free alternative to the IDHR investigation process. The IDHR Mediation Program has a settlement rate of over 80%.

Have you considered the advantages of MEDIATION?

MEDIATION...

> ...Is **free** - There is no cost to you or the other party. You schedule a mediation conference and attend– that's it!

> ...Is **convenient** - Parties can attend a mediation conference virtually or in person.

> ...Is **fast** – Cases can be mediated before the case is assigned for investigation, and conference sessions are generally scheduled for 9 am – 1 pm or 1 pm – 5 pm. Investigations typically last one year

> ...Is **confidential** – Participation in the IDHR Mediation Program will not affect the outcome of your case. The IDHR investigation is a completely separate process that will not be influenced by the mediation conference.

> ...Is **not** a hearing on the merits of the charge. The purpose of mediation is to settle the charge by letting the parties discuss their differences and explore options that resolve the dispute.

If you are interested in Mediation, contact the IDHR Mediation Unit at (312) 814-6738 or by email at: IDHR.Mediation@illinois.gov.



# State of Illinois
# **Department of Human Rights**

dhr.illinois.gov

## NOTICE OF RIGHT TO OPT OUT

Dear Complainant and Respondent:

Pursuant to Public Act 100-1066, Public Act 100-0221, and Section 7A-102(C-1) of the Illinois Human Rights Act [775 ILCS 5/7A-102(C-1)], the Illinois Department of Human Rights ("IDHR") is required to provide to Complainant and to Respondent notice of Complainant's right to opt out of IDHR's investigation to file a civil action in circuit court.

To opt out of IDHR's investigation, Complainant must submit a request in writing to IDHR within 60 days of receipt of this notice. Upon receipt of Complainant's request to opt out, IDHR will send to the parties a notice of Complainant's right to commence a civil action in circuit court or other appropriate court of competent jurisdiction, and of administrative closure.

IDHR's Opt Out Request Form is available at the following location on IDHR's website:

dhr.illinois.gov/opt-out

Sincerely,

INTAKE UNIT

INTAKE/IN-6 (7A-102(C-1))
Rev. 04/25

# State of Illinois
# Department of Human Rights

dhr.illinois.gov

## CREDIBILITY NOTICE

### The Cooper v. Salazar injunction

The Illinois Department of Human Rights (IDHR) is under a federal-court injunction that, among other things, orders the IDHR:

'To cease permanently from relying on credibility determinations made without affording the rights of confrontation and cross-examination'.

See, Cooper v. Salazar, #98 C 2930, U.S. District Court for the Northern District of Illinois, order dated November 1, 2001, at p. 26, ¶1.

### Meaning of the Cooper Injunction

The IDHR cannot assess the credibility of Complainant's testimony, the testimony of Complainant's witnesses or the testimony of Respondent's representatives or the witnesses of Respondent where there is conflicting testimony. In other words, if the determination of substantial evidence turns on issues of credibility, the IDHR should make a finding of substantial evidence so that a trier of fact may resolve those issues of credibility. This means that if a determination of lack of substantial evidence requires the IDHR to make a finding of fact as to conflicting evidence, the IDHR will make a finding of substantial evidence so that credibility may be resolved by the Human Rights Commission at a Public Hearing.

The Illinois Human Rights Act defines 'substantial evidence' as:

'Evidence which a reasonable mind accepts as sufficient to support a particular conclusion and which consists of more than a mere scintilla but may be somewhat less than a preponderance'. Illinois Human Rights Act §7A-102(D)(2), codified at 775 ILCS 5/7A-102(D)(2).

### The Meaning of Credibility

The Illinois Department of Human Rights is an investigatory agency. The IDHR's purpose is to gather all of the evidence from each of the parties as to whether Respondent may or may not have discriminated against the Complainant within the meaning of the Illinois Human Rights Act. The IDHR's purpose is to review all of the evidence and make a determination based upon the law as to whether there is sufficient evidence of discrimination to file a complaint against the Respondent with the Illinois Human Rights Commission. The IDHR will not make a finding that evidence submitted by a party is either believable or not believable. Thus, the IDHR will not base its findings on the fact that one of the parties is not telling the truth or that one party's evidence is not believable. If the resolution of the charge of discrimination requires believing the evidence of one party over another party, the IDHR will make a finding of Substantial Evidence and refer the matter to the Illinois Human Rights Commission so that a trier of fact may resolve the case.

### Conflicting evidence exists when there are:

1) Statements of a person with material firsthand knowledge contradicted by statements of a different person with material firsthand knowledge.
2) Business records contradicted by oral statements of a person with material firsthand knowledge.
3) Business records of one person contradicted by business records of another person.

By the authority of the State of Illinois (2212013ENGChargeProcessing)